United States, Appellee

v.

Daniel J. SAUNDERS, III, Specialist
U.S. Army, Appellant

No. 02-0784

Crim. App. No. 9900899

_____

_____

United States Court of Appeals for the Armed Forces

Argued February 5, 2003

Decided July 16, 2003

BAKER, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., GIERKE, EFFRON, and ERDMANN, JJ., joined.


Counsel

For Appellant: Captain Mary E. Card (argued);
Colonel Robert D. Teetsel, and Major Imogene M. Jamison (on
brief); Lieutenant Colonel E. Allen Chandler, Jr.

For Appellee: Captain Janine P. Felsman (argued); Colonel
Lauren B. Leeker, Lieutenant Colonel Margaret B. Baines,
and Major Jennifer H. McGee (on brief).



Military Judge: Donna M. Wright


THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.

JUDGE BAKER delivered the opinion of the Court.

Appellant was tried by members at a general court-martial in Wuerzburg, Germany.  Contrary to his pleas, Appellant was convicted of attempted rape, failing to obey a no-contact order issued by his company commander (five specifications), forcible sodomy, assault consummated by a battery (three specifications), unlawful entry, and "harassment" in violation of Articles 80, 92, 125, 128, and 134, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 880, 892, 925, 928, 934, respectively.  The adjudged and approved sentence provided for a bad conduct discharge, confinement for three years, total forfeitures, and reduction to the lowest enlisted grade.

The Army Court of Criminal Appeals dismissed the words "wrongfully calling" from the Article 134 harassment specification as redundant, but otherwise affirmed the findings and sentence.  United States v. Saunders, 56 M.J. 930 (A. Ct. Crim. App. 2002).

We granted review of the following issue:

> WHETHER THE ARMY COURT OF CRIMINAL APPEALS ERRED BY UPHOLDING THE CONVICTION FOR HARASSMENT UNDER ARTICLE 134, AS THE SPECIFICATION FAILS TO STATE AN OFFENSE.

We hold that the Court of Criminal Appeals did not err and, therefore, we affirm.

BACKGROUND

Appellant was charged with harassment for a course of conduct over a six-month period.  This conduct was itself preceded by a consensual relationship with H.  As a result, some factual detail is necessary in order to consider and evaluate the legal issue raised.

In January 1998, Appellant met and began dating H, a German national, while he was stationed in Germany.  Three months later, she accepted his proposal of marriage.  However, no date was set for the wedding because Appellant was already married and needed to obtain a divorce from his current wife.

H testified that over the next few months, Appellant became "possessive" of her and began calling her daily, following her, and always wanting to be with her.  In September 1998, H told Appellant that she wanted to break off the relationship and "just be friends."  Appellant refused to accept this arrangement and continued to visit daily, always wanting to "hug and kiss [H]" when he visited.  He also called H at all hours of the day and night, both at home and at work.  H testified that Appellant was "terrorizing" her with his telephone calls and that she "felt very uneasy."  At one point, Appellant called H at work from the telephone in her own apartment.

Appellant admitted to H that he entered her apartment during this time period, using emergency keys that were kept hidden outside.  H testified that she had lent Appellant her own keys on different occasions when they were dating and that he knew where she kept the emergency keys from having seen her use them.  However she stated that she had not given him permission to use or copy the emergency keys.  When Appellant was later searched prior to entering pretrial confinement, keys to H's apartment and building were found under the insole of his shoe.

In January 1999, Appellant visited H, and H told him that she didn't want to see him anymore.  In response, Appellant locked himself in her kitchen and attempted to cut his wrists with a knife.  H apparently persuaded him to desist and agreed to exercise with him occasionally at the gym.  According to her, Appellant "calmed down" after that but continued to call H "too many times to be friends," including calling her repeatedly in the middle of the night.  On one occasion, when H did not answer his late night calls, Appellant came to her door at 3:00 a.m.  H let him in, again told him that she did not want to see him, and Appellant again locked himself in the kitchen, threatening suicide.  Despite Appellant's conduct and H's January 1999 statement that she did not want to see him

4

anymore, H testified on cross-examination that she had consensual sex with Appellant in February.

In mid March, H went to her parents' home in Reichenbach because, according to her, she "just couldn't take it any more with all this psycho-terror, and [she] just had to get away, and so [she] went home to escape." Appellant then called her at her parents' home on a weekend, saying that he was lost nearby and needed directions. He later came to her parents' house. While H testified she had given Appellant her parents' telephone number, she had never told him how to get to their home.

On March 21, Appellant left a note on H's door saying that he was going to commit suicide by taking pills. This convinced H to file a report with the American military police detailing Appellant's prior conduct toward her. She later testified that she had previously attempted to get help from the German police based on Appellant's prior acts, but had been told that they could not help her "at that point." When H returned home from filing her report, Appellant was in a car at her apartment with three empty pill bottles. H testified about the encounter as follows:

> [I told him] that I made a police report, and he begged me to drop the charges. And he promised me that he would never bother me again, if that's what I really wanted. I said, "Yes." . . . And he promised me he would, and so I called-I called again, and I

asked them to drop the charges, but they told me it
was already too late.

Sergeant (SGT) Gilman, the Company NCO contacted by H,
informed Appellant's Company Commander, Captain (CPT)
Powers, about her statement. CPT Powers then spoke with
the battalion commander about Appellant's apparent suicidal
gesture and Appellant was subsequently admitted to
Landstuhl hospital for a week. Appellant also called H
from the hospital.

Following his release from the hospital on March 29,
Appellant returned to his unit and was put on convalescent
leave for 72 hours based on the recommendation of the
hospital psychiatrist. Appellant visited H again on March
29, claiming to want to return a badminton racket that she
had given him. Not wanting Appellant in her apartment, H
went to meet him at the gate. However, Appellant followed
her back to her door and entered the apartment. Appellant
stayed briefly, telling H that he did not want to kill
himself. Afterwards, H made repeated calls to SGT Gilman
asking him to tell Appellant to leave her alone.

A written no-contact order was issued to Appellant on
March 31 by CPT Powers. The order stated that Appellant
should have no physical or written communication with H and
that he should not telephone her apartment, workplace,

friends, or parents. CPT Powers discussed the order with Appellant.

During the first weeks of April, despite the no-contact order, Appellant continued to contact H, leaving her notes and calling repeatedly. Around April 8, Appellant left a message on H's answering machine asking her to return a diamond ring that he had given her. H went to her parents' home that weekend and returned on April 11 to find that her car had been scratched and that a diamond ring Appellant had given her was missing from her apartment, along with copies of her reports to the military police and SGT Gilman's telephone number. H went to complain to SGT Gilman personally, and when she returned, Appellant called again and then came to her apartment. This time, H did not let him in the apartment. H's brother was with her at the time and she asked him to tell Appellant to leave.

Appellant continued to come by H's apartment almost every day between April 11 - 23. On April 23, H returned home to find two telephone messages from Appellant. He then came by the apartment asking her to let him in, but H refused and spoke to him through the door. Appellant told her that he would use his own key if she refused to let him in and showed her a key. Appellant demanded that she

7

return letters that he had written as well as gifts he had given her. H testified that she put the items in a bag and dropped them off her balcony to Appellant, and then refused to speak with him further.

About an hour later, H's electricity went out. When she went downstairs to check her fuse box, she found Appellant hiding behind a door near her fuse box in the basement. He put his hands around her neck, but did not squeeze. When H began to cry and told Appellant to go away, he grabbed her wrist and pulled her up the stairs and forced her keys out of her hand. Appellant then told H he was hungry and asked for some food. H gave him some chips and dip, the first thing that she could find. Appellant asked H if they should wash the dishes and H complied, hoping to find an excuse to leave the room and call for help. He then pulled H into her bedroom, removed her clothes, attempted to tie her to the bed with a towel, and sexually assaulted her. Afterwards, he dressed H, dragged her to the kitchen, and told her that she would "have to watch him die now." When Appellant went to the drawer for a knife, H escaped out onto her balcony and ran to a neighbor's house and called the police.

In response to this pattern of behavior, the Government charged Appellant with "harassment"[1] under clause 2 of Article 134, using the Georgia statute[2] on "stalking" as a basis for the elements of the specification. The specification at issue read as follows:

> In that SPC Daniel Saunders, U.S. Army, did at or near Wuerzburg, Germany, on divers occasions between on or about 1 October 1998 and 23 April 1999, knowingly and willfully harass Ms. [H], by following her without consent, waiting for her at home, showing up at her home uninvited at all hours of the day and night, attempting to gain access to her home, breaking into her home, calling her at work from her home phone, wrongfully calling her incessantly on the

---

[1] "Harassment" as charged here is distinct from "sexual harassment," which is often charged as maltreatment under Article 93, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 893 (2000). "Harassment" as charged in this case is also commonly referred to as "stalking" in federal and state statutes. For consistency with the record of trial, "harassment" is used here.

[2] The Georgia stalking law in force at the time, Ga. Code Ann. § 16-5-90 (1997), stated:

(a) <u>A person commits the offense of stalking when he or she follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person</u>. For the purpose of this article, the term "place or places" shall include any public or private property occupied by the victim other than the residence of the defendant. For the purposes of this article, the term "<u>harassing and intimidating</u>" means a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear of death or bodily harm to himself or herself or to a member of his or her immediate family, and which serves no legitimate purpose. This Code section shall not be construed to require that an overt threat of death or bodily injury has been made.

(b) Except as provided in subsection (c) of this Code section, a person who commits the offense of stalking is guilty of a misdemeanor.

(c) Upon the second conviction, and all subsequent convictions, for stalking, the defendant shall be guilty of a felony and shall be punished by imprisonment for not less than one year nor more than five years.

(Emphasis added.)

phone at all hours of the day at both home and work, wrongfully refusing to leave her house when asked, locking himself in rooms of her home, repeatedly threatening to kill himself, wrongfully visiting her place of employment, wrongfully calling, visiting and attempting to gain access to her parent's home in Lichtenfels, Germany, and willfully damaging her car, thereby causing the said Ms. [H] substantial emotional distress and reasonable fear of bodily injury, such conduct being of a nature to bring discredit upon the armed forces.

At trial, Appellant made a motion to dismiss the harassment specification under Article 134 for failure to state an offense.  The military judge denied this motion and found as follows:

My ruling is that it states an offense; there are a number of acts in there that it alleges the accused did.  Certainly, those acts could be considered wrongful and could be a violation of Article 134.  This is exactly what 134 was designed for – to cover those situations where you don't have a violation of another enumerated article; and it's up to the members to decide whether it's a violation of 134 and whether it's either service discrediting or prejudicial to good order and discipline.

At the close of the evidence the military judge instructed the members on the harassment charge using the language of the specification.  The military judge defined the terms "service discrediting conduct" and "harassed" for the members as follows:

Service discrediting conduct is conduct which tends to harm the reputation of the service or lower it in public esteem.  The term 'harassed' means a knowing and willful course of conduct directed at a specific person which would cause substantial emotional

10

distress in a reasonable person or which placed that person in reasonable fear of bodily injury.

The members found Appellant guilty by exceptions and substitutions as follows:

In that SPC Daniel Saunders, U.S. Army, did at or near Wuerzburg, Germany, on divers occasions between on or about 1 October 1998 [21 March 1999] and 23 April 1999, knowingly and willfully harass Ms. [H], by following her without consent, waiting for her at home, showing up at her home uninvited at all hours of the day and night, attempting to gain access to her home, breaking into her home, calling her at work from her home phone, wrongfully calling her incessantly on the phone at all hours of the day at both home and work, wrongfully refusing to leave her house when asked, locking himself in rooms of her home, repeatedly threatening to kill himself, wrongfully visiting her place of employment, wrongfully calling, visiting and attempting to gain access to her parent's home in Lichtenfels, Germany, and willfully damaging her car, thereby causing the said Ms. [H] substantial emotional distress and reasonable fear of bodily injury, such conduct being of a nature to bring discredit upon the armed forces.

Saunders, 56 M.J. at 933.

The members found Appellant not guilty of the underlined language above and substituted "21 March 1999," the date when H first filed a report with the military police, for the start of the offense. Id. at n.2.[3] On appeal, Appellant renews his argument that "harassment" as charged in his case does not constitute an offense under Article 134.

_____

[3] The Army Court of Criminal Appeals dismissed the words "wrongfully calling" from the specification as redundant. United States v. Saunders, 56 M.J. 930, 933 n.2 (A. Ct. Crim. App. 2002).

11

DISCUSSION

Article 134, UCMJ, the "General Article," criminalizes service-discrediting conduct by military service members.[4] Certain specified offenses are included under this Article. See Manual for Courts-Martial, United States (2002 ed.) [hereinafter MCM] Part IV, paras. 61-113.  However, "if conduct by an accused does not fall under any of the listed offenses . . . a specification not listed in this Manual may be used to allege the offense."  Id. at Part IV, para. 60.c.(6)(c).  In this case, the defense was apprised that the government was using a specification modeled on the Georgia State stalking statute.[5]  The present question is whether Appellant had "fair notice" such conduct was subject to criminal sanction, and if so, whether harassing

---

[4] The Manual for Courts-Martial, United States (2002 ed.) [hereinafter MCM] Part IV, para. 60.b.(1)-(2), lists two requirements under Article 134 if the conduct addressed is "of a nature to bring discredit upon the armed forces":
    1. That the accused did or failed to do certain acts; and
    2. That, under the circumstances, the accused's conduct was . . . of a nature to bring discredit upon the armed forces.

[5] However, in doing so, the Government did not adopt all the elements of the Georgia statute verbatim.  Unlike the Georgia statute, Appellant's specification does not allege that Appellant's conduct was undertaken "for the purpose of harassing and intimidating the other person" as suggested by section (a) of the Georgia statute.  The MCM does not necessarily require parallel pleading between Article 134 and a model state statute.  MCM Part IV, para. 60.c.(6)(c) does not require that the Government model its unlisted specifications under Article 134 on one or more particular state statutes where the offense is charged under clause 1 or 2, rather than as an assimilated offense under clause 3; however, as discussed below due process does require "fair notice" that conduct is criminal.

conduct as charged here, states an offense under Article 134.

Whether the military judge correctly understood and applied the proper legal principle in denying the motion to dismiss is a question we review de novo.  United States v. Hughes, 48 M.J. 214, 216 (C.A.A.F. 1998).

Fair Notice

A.  Notice of Criminal Sanction

Appellant claims that he lacked fair notice that his conduct was punishable under Article 134 because "harassment" is not an offense specified in the Manual for Courts-Martial.  He also argues that his dependent personality disorder prevented him from knowing that his conduct was unlawful.

It is well settled that conduct that is not specifically listed in the MCM may be prosecuted under Article 134.  United States v. Vaughan, 58 M.J. 29, 31 (C.A.A.F. 2003)(prosecution of child neglect is cognizable under Article 134); see MCM Part IV, para. 60.c.(6)(c)(permitting the use of specifications not listed in the MCM to allege offenses not listed in paras. 61-113 as offenses under clause 1 or 2 of Article 134).[6]  However,

---

[6] United States v. Bivins, 49 M.J. 328, 330-31 (C.A.A.F. 1998) (permitting bigamy prosecution even when elements of specified Article 134 bigamy not met); United States v. Sullivan, 42 M.J. 360, 366

due process requires that a person have fair notice that an act is criminal before being prosecuted for it.  Vaughan, 58 M.J. at 31.

   In Vaughan, this Court identified from longstanding case law several potential sources of "fair notice" including: federal law, state law, military case law, military custom and usage, and military regulations.  Id. at 31-32; see Parker v. Levy, 417 U.S. 733, 755 (1974).[7] Unlike the circumstances addressed in Vaughan or United States v. Davis, 26 M.J. 445 (C.M.A. 1988)(prosecuting "cross-dressing" under Article 134), in Appellant's case there is a federal criminal statute relevant to Appellant's offense although not applicable because his conduct occurred in Germany.  Title 18 U.S.C. § 2261A (1997), the interstate stalking statute, provides:

> Whoever travels across a State line or within the special maritime and territorial jurisdiction of the United States with the intent to injure or harass

---

(C.A.A.F. 1995)(noting that "[i]n our view, any reasonable officer would know that asking strangers of the opposite sex intimate questions about their sexual activities, using a false name and a bogus publishing company as a cover, is service-discrediting conduct under Article 134."); United States v. Choate, 32 M.J. 423, 425 (C.M.A. 1991)(noting that when an offense is charged under "the service-disorder or –discredit clause of Article 134[,] . . . the specific elements of the crime . . . as a matter of civilian or military law are not particularly relevant."); United States v. Davis, 26 M.J. 445, 447 (C.M.A. 1988).

[7] Although United States v. Vaughan, 58 M.J. 29 (C.A.A.F. 2003), focused on state law, military case law, and military custom and usage as sources of notice, we expressly did not need to reach a conclusion as to whether one or more of these sources might on its own have provided fair notice in the context presented.  Id. at 31.

> another person, and in the course of, or as a result
> of, such travel places that person in reasonable fear
> of the death of, or serious bodily injury (as defined
> in section 1365(g)(3) of this title) to, that person
> or a member of that person's immediate family (as
> defined in section 115 of this title) shall be
> punished as provided in section 2261 of this title

(Emphasis added.)

While 18 U.S.C. § 2261A could apply to a broad range of conduct, the language of the statute has been upheld against a challenge for overbreadth and vagueness. United States v. Young, No. 98-4742, 1999 U.S. App. LEXIS 32721, at *13 (4th Cir. Dec. 16, 1999), cert. denied, Young v. United States, 529 U.S. 1081 (2000)(noting that a person must induce "reasonable" fear in order to be guilty under this law).

In addition to the federal statute, all fifty states and the District of Columbia have enacted criminal laws addressing stalking or harassing conduct.[8]  Further, several

---

[8] All of these laws were in effect at the time of Appellant's conduct. Ala. Code § 13A-6-90 (Michie, LEXIS through 2003 Sess.); Alaska Stat. § 11.41.270 (Michie, LEXIS through 2002 Sess.); Ariz. Rev. Stat. § 13-2923 (LEXIS through 2002 Sess.); Ark. Code Ann. § 5-71-208 (Michie, LEXIS through 2002 Sess.); Cal. Penal Code § 646.9 (Deering, LEXIS through 2002 Sess.); Colo. Rev. Stat. § 18-9-111 (LEXIS through 2002 Sess.); Conn. Gen. Stat. § 53a-181d (LEXIS through Jan. 6 Spec. Sess.); Del. Code Ann. tit. 11, § 1312A (LEXIS through 2002 Sess.); D.C. Code Ann. § 22-404 (LEXIS through Mar. 14, 2003); Fla. Stat. ch. 784.048 (LEXIS through 2002 Sess.); Ga. Code Ann. § 16-5-90 (LEXIS through 2002 Reg. Sess.); Haw. Rev. Stat. Ann. § 711-1106.5 (Michie, LEXIS through 2002 Reg. Sess.); Idaho Code § 18-7905 (Michie, LEXIS through 2003 Sess.); 720 Ill. Comp. Stat. 5/12-7.3 (LEXIS through Mar. 26, 2003); Ind. Code Ann. § 35-45-10-1,2,5 (Michie, LEXIS through 2002 Spec. Sess.); Iowa Code § 708.11 (LEXIS through 2003 ed.); Kan. Stat. Ann. § 21-3438 (LEXIS through 2002 Supp.); Ky. Rev. Stat. Ann. § 508.130, .140, .150 (Michie, LEXIS through 2002 Reg. Sess.); La. Rev. Stat.

United States v. Saunders, No. 02-0784/AR

state statutes have been applied by military authorities to address harassment, demonstrating that military authorities have looked to state statutes to address harassment in the absence of a specified Article 134 offense.  This Court affirmed a conviction under North Carolina's anti-stalking law that was charged under Article 134 by means of the Assimilative Crimes Act (ACA), 18 U.S.C. § 13 (2000). United States v. Sweeney, 48 M.J. 117 (C.A.A.F. 1998),

---

14:40.2 (West, LEXIS through 2002 Sess.); 17 Me. Rev. Stat. Ann. tit. 17-A, § 210-A (West, LEXIS through Feb. 19, 2003); Md. Code Ann., Criminal Law § 3-802 (LEXIS through 2002 Sess.); Mass. Gen. Laws ch. 265, § 43 (LEXIS through June 12, 2003); Mich. Comp. Laws § 750.411h (LEXIS through Apr. 4, 2003); Minn. Stat. § 609.749 (LEXIS through 2002 Legis.); Miss. Code Ann. § 97-3-107 (LEXIS through 2002 Reg. & 3d Extraordinary Sess.); Mo. Rev. Stat. § 565.225 (LEXIS through 2002 Legis.); Mont. Code Ann. § 45-5-220 (LEXIS through 2002 Spec. Sess.); Neb. Rev. Stat. Ann. § 28-311.02-.03 (Michie, LEXIS through 2002 3d Spec. Sess.); Nev. Rev. Stat. Ann. § 200.571-.575 (LEXIS through 71st Reg. (2001) & 18th Spec. (2002) Sess.); N.H. Rev. Stat. Ann. § 633:3-a (LEXIS through 2002 Sess.); N.J. Stat. Ann. § 2C:12-10 (West, LEXIS through May 8, 2003); N.M. Stat. Ann. § 30-3A-3 (Michie, LEXIS through Nov. 5, 2002); N.Y. Penal § 120.14-.15 (Consol., LEXIS through May 20, 2003); N.C. Gen. Stat. § 14-277.3 (LEXIS through 2002 Sess.); N.D. Cent. Code § 12.1-17-07.1 (LEXIS through 2001 Gen. & Spec. Sess.); Ohio Rev. Code Ann. § 2903.211 (Anderson, LEXIS through Feb. 15, 2003); Okla. Stat. tit. 21, § 1173 (LEXIS through 2003 Supp.); Or. Rev. Stat. § 163.732 (LEXIS through 2001 Reg. Sess.); 18 Pa. Cons. Stat. § 2709 (LEXIS through Act 237 of 2002 Legis. Sess.); R.I. Gen. Laws § 11-59-1, -2 (LEXIS through Jan. 2002 Sess.); S.C. Code Ann. § 16-3-1700, -1710 (Law. Co-op., LEXIS through 2002 Supp.); S.D. Codified Laws § 22-19A-1, -5 (Michie, LEXIS through 2003 Sess.); Tenn. Code Ann. § 39-17-315 (LEXIS through 2002 Sess.); Tex. Penal Code Ann. § 42.07 (Vernon, LEXIS through 2001 Legis.); Utah Code Ann. § 76-5-106.5 (LEXIS through 2002 6th Spec. Sess.); Vt. Stat. Ann. tit. 13, § 1061-1062 (LEXIS through 2003); Va. Code Ann. § 18.2-60.3 (Michie, LEXIS through 2003 Reg. Sess.); Wash. Rev. Code Ann. § 9A.46.110 (LEXIS through Nov. 2002); W. Va. Code § 61-2-9a (LEXIS through 2003 Reg. & 1st Extraordinary Sess.); Wis. Stat. § 940.32 (LEXIS through 2001-02 Legis.); Wyo. Stat. Ann. § 6-2-506 (Michie, LEXIS through 2003 Reg. Sess.).  See Major Joanne P.T. Eldridge, Stalking and the Military: A Proposal to Add an Anti-Stalking Provision to Article 134, Uniform Code of Military Justice, 165 Mil. L. Rev. 116 (2000); Marjorie A. Caner, Annotation, Validity, Construction, and Application of Stalking Statutes, 29 A.L.R. 5th 487, §7 (1995 & Supp. 2002).

16

United States v. Saunders, No. 02-0784/AR

aff'g United States v. Sweeney, ACM No. 32026, 1997 CCA

LEXIS 37 (A.F. Ct. Crim. App. Jan. 17, 1997).  While the

ACA would not apply here because Appellant's actions took

place in Germany, approval by this Court of an assimilated

stalking offense provides notice that such conduct is

punishable under the UCMJ, at least when the ACA applies.

The Air Force Court of Criminal Appeals has also

addressed harassment.  Id.; United States v. Rowe, ACM No.

32852, 1999 CCA LEXIS 125 (A.F. Ct. Crim. App. Apr. 7,

1999), pet. denied, 52 M.J. 417 (C.A.A.F. 1999)(affirming

Article 134 harassment specification); United States v.

Diaz, 39 M.J. 1114 (A.F.C.M.R. 1994)(setting aside offense

because judge failed to instruct on the definition of

harassment).  In addition, the Air Force Court of Criminal

Appeals affirmed a "harassment" charge with elements based

on the same Georgia statute.  Rowe, ACM No. 32852, 1999 CCA

LEXIS 125 at *7.

In summary, while the terms vary somewhat from statute

to statute, federal and state statutes criminalize the act

of knowingly pursuing a course of conduct that would

produce emotional distress in a reasonable person or create

a reasonable fear of death or injury to that person or an

immediate family member when that course of conduct in fact

17

creates emotional distress and reasonable fear in the targeted person. See 18 U.S.C. § 2261A; __ M.J. (15 n.8).

In addressing this issue, we are also cognizant that the federal stalking statute and roughly half of state statutes charge harassment as a specific intent offense requiring an intent to harass.[9] A bare majority of statutes require a knowing and willful course of conduct that has the result of placing a person in reasonable fear or emotional distress without requiring proof of a specific intent to produce that result. Therefore, we must also consider, in light of this statutory landscape, whether Appellant's "fair notice" of sanction was undermined by the mens rea variance in state statutes.

In Parker, and subsequent military case law, courts have addressed Article 134 in light of the due process clause, concluding that fair notice that one's conduct is subject to criminal sanction requires something more than the notice provided by the service discrediting words of element 2 of Article 134. However, in doing so, the Court did not require notice of specific elements set down in

---

[9] There is some division among states as to whether a "specific intent" to harass is required as an additional element of the crime, above and beyond the mental state that accompanies the act. See 1 Wayne R. LaFave & Austin W. Scott Jr., Substantive Criminal Law § 3.5 (1986 & Supp. 2003). Twenty-six of the state statutes in force at the time would permit a conviction without a clear showing that the defendant intended to harass the victim. The charge used here stated that Appellant "knowingly and willfully harass[ed H]."

writing before the offense is committed, only "fair notice" that conduct was criminal. 417 U.S. at 752, 755-56. This is evident in the Court's acceptance that such notice could arise from military custom and usage, which is clearly not defined by elements or with mens rea specificity. Id. at 754. Moreover, in Parker the Court recognized and accepted that those undertaking service to their country in the military might appropriately be subjected to a higher standard of behavior than provided for in civilian society and that the constitutional measure of review, as in Parker's case, might vary between the two with respect to the application of Article 134 to the military. Id. at 756-57. Thus, the Court stated that "even though sizable areas of uncertainty as to the coverage of the [general] articles may remain after their official interpretation by authoritative military sources, further content may be supplied even in these areas by less formalized custom and usage." Id. at 754. In short, under Parker, a military accused is entitled to "fair notice" of the criminality of conduct charged as service discrediting under Article 134, which does not necessarily require published notice of the precise wording of the elements. Such a view is consistent with Article 134's purpose of capturing service discrediting conduct that might not have been foreseen by

19

the drafters of the UCMJ or those charged with its subsequent implementation in changing and complex military circumstances. See id. at 745-46 (tracing the history and language of Article 134).

Thus, the question presented here is not whether there is a difference between state statutes, but whether the state statutes would have placed a reasonable soldier on fair notice that harassment, as charged in this case, was service discrediting conduct under Article 134. We believe the statutory landscape does just that. All fifty states and Title 18 punish harassment as either a specific or general intent offense. A "specific intent" to harass therefore is not universally required, nor is it a "majority" rule. The core concept of criminality described in all these statutes – a knowing and willful course of intimidation or harassment that places a reasonable person in fear of death or bodily harm or that causes emotional distress -- is patently conduct that would be service-discrediting under Article 134. A reasonable soldier would understand as much. See Sullivan, 42 M.J. at 366. In light of this body of law as well as the military case law cited above we conclude that Appellant was on "fair notice" that he risked prosecution under Article 134 if he knowingly engaged in a course of conduct that placed

another person in reasonable fear of injury or emotional distress.  See Vaughan, 58 M.J. at 32.

B.    Notice of Specification Elements

In addition to notice that an act is a crime, a person must also have "fair notice as to the standard applicable to the forbidden conduct" against which they must defend. Id. at 31 (citing Parker, 417 U.S. at 755).  Thus, an Article 134 specification must contain words of criminality and provide the accused with notice of the elements of the crime alleged.  Id. at 35.  The specification required the members to determine that Appellant carried out "a knowing and willful course of conduct directed at a specific person [H] which would cause substantial emotional distress in a reasonable person or which placed that person in reasonable fear of bodily injury."  This specification adequately provides notice as to the dates and times of the acts charged and the requisite mental state.  See id. at 35 n.4. The requirements of emotional distress in a reasonable person and placing a person in reasonable fear are common legal standards.  See id. at 35 (upholding definition of culpable negligence by conduct that was "reasonable under the circumstances"); Marjorie A. Caner, Annotation, Validity, Construction, and Application of Stalking Statutes, 29 A.L.R. 5th 487, §11 (1995 & Supp. 2002)(citing

cases upholding statutes that prohibit conduct based on an objective standard, such as conduct that causes "reasonable" fear or emotional distress in a "reasonable" person).

We conclude that for military practice, harassment is appropriately charged as a general intent offense, when charged under clause 2 of Article 134. This is consistent with the prior application of Article 134 and it is consistent with the purpose behind stalking and harassment statutes – to protect persons from reasonable fear generated by the unwanted advances and contacts of others, without consideration of the abstract motives, some pure, some not, that might have motivated the prohibited conduct. Inadvertent or de minimis, but willful, contact would not constitute an offense under Article 134. For, as the military judge correctly instructed, harassment under Article 134 requires "a knowing and willful course of conduct directed at a specific person, which would cause substantial emotional distress in a reasonable person or which placed that person in reasonable fear of bodily injury." (Emphasis added.)

As the military judge also stated, the decision as to whether a given set of acts rises to the level of harassment is left to the fact finder. See Vaughan, 58

22

M.J. at 35-36. In addition to adequately informing the accused of the elements of the offense, the specification must also set out conduct that a fact finder could determine was service discrediting in the context presented. Id. (affirming a conviction of child neglect for leaving infant unattended in a crib for six hours); Davis, 26 M.J. at 449 (finding that "cross-dressing" stated an offense under particular facts and circumstances); United States v. Sadinsky, 14 C.M.A. 563, 565, 34 C.M.R. 343, 345 (1964)(noting that Article 134 is "not such a catchall as to make every irregular, mischievous, or improper act a court-martial offense."). While the "addition of words of criminality . . . cannot make criminal acts which obviously are not, here that allegation serves to demonstrate the proscribed character of accused's act." Sadinsky, 14 C.M.A. at 565, 34 C.M.R. at 345.

In this case, a reasonable fact finder could find that Appellant's conduct constituted "harassment." Appellant repeatedly called and visited H, and entered her apartment against her wishes, all after receiving a no-contact order. His telephone calls and visits continued over several weeks and included suicide threats, unlawful entry, and angry demands for the return of gifts, all despite protestations by H that she did not want such conduct to continue. A

23

reasonable jury could find that Appellant's actions taken together constituted a "course of conduct" that harassed H by placing her in reasonable fear of harm and emotional distress in the context of these facts.[10]

### Personality Disorder

The first element of the offense was that "[A]ppellant knowingly and willfully harassed H." Saunders, 56 M.J. at 933. The judge defined "harassed" for the members as "a knowing and willful course of conduct directed at a specific person which would cause substantial emotional distress in a reasonable person or which placed that person in reasonable fear of bodily injury." Id.

At trial, Appellant made the argument that his mental condition prevented him from acting "willfully" and the military judge advised the members that "an accused because of some underlying mental condition, may be mentally incapable of acting willfully." (Appellant did not argue that he was not criminally responsible by

---

[10] All but seven states require repeated acts or a "course of conduct" as an element of harassment. Colorado, Georgia [under its current statute], Hawaii, Indiana, Minnesota, New Hampshire, and Texas permit prosecution based on a single incident. As Appellant was charged with repeated acts, this distinction would not limit his prosecution under state law. As noted in Vaughan, an important distinction exists between notice that conduct is criminally punishable and a common sense understanding that it is bad judgment. 58 M.J. at 33 n.3. However, the potential for close cases on the margin does not preclude prosecution on grounds of notice as to what the law prohibits.

reason of insanity.)  Nonetheless, the members found Appellant guilty by exceptions and substitutions for some acts, but found the requisite mental state.

On appeal, Appellant now argues that his dependent personality disorder prevented him from fairly knowing that his conduct was wrongful.  Appellant correctly notes that a law is "void for vagueness" if "one could not reasonably understand that his contemplated conduct is proscribed." See Vaughan, 58 M.J. at 31 (citing Parker, 417 U.S. at 757) (emphasis added).  However, Appellant further argues that whether he had notice of the criminality in his case must be determined in light of his "delusional disorder and dependent personality disorder," which caused him to believe that H was his one true love, thereby preventing him from understanding that his course of conduct could be criminal.

However, Appellant's subjective belief is irrelevant to the issue of notice.  It is settled law that notice is determined through application of an objective test as to whether a person could "'reasonably understand that his contemplated conduct is proscribed.'"  Id. (quoting Parker, 417 U.S. at 757).

## Service Discrediting Conduct

Finally, Appellant argues that his conduct was not service discrediting. His acts, he contends, were not prohibited by German law. Furthermore, he argues that they were not the acts of "moral turpitude" contemplated by Article 134, as found in cases involving obscene phone calls and sexually explicit letters. See Sullivan, 42 M.J. at 363 (charging obscene phone calls in the guise of a survey); United States v. Hartwig, 39 M.J. 125 (C.M.A. 1994)(charging the writing of sexually suggestive letters under Article 133, UCMJ, 10 U.S.C. § 933 (2000)). His attentions were directed to his former fiancée, as part of a failed relationship, and not indecent acts directed at a stranger or public figure.

Appellant, however, is arguing facts rather than law. The test of service discredit is whether Appellant's acts had a "tendency to bring the service into disrepute[.]" MCM Part IV, para. 60.c.(3). "'Discredit' means to injure the reputation of [sic]. This clause . . . makes punishable conduct which has a tendency to bring the service into disrepute or which tends to lower it in the public esteem." Id. We hold that a reasonable fact finder could find beyond a reasonable doubt that Appellant's

26

course of conduct, recounted in detail above, was service discrediting.

## Decision

The decision of the United States Army Court of Criminal Appeals is affirmed.