# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## UNITED STATES

v.

## David R. THOMS
### Seaman (E-3), U.S. Coast Guard

### CGCMG 0288
### Docket No. 1370

### 15 April 2014

General Court-Martial convened by Commander, Coast Guard Pacific Area. Tried at Seattle, Washington, on 21-22 December 2011, and Alameda, California, on 30 January-3 February 2012.

| | |
|---|---|
| Military Judge: | CAPT Michael E. Tousley, USCG |
| Trial Counsel: | LT Michael J. Meyer, USCG |
| Assistant Trial Counsel: | LT Luke R. Petersen, USCG |
| Defense Counsel: | LT Margaret M. Villagran, JAGC, USN |
| Assistant Defense Counsel: | LT Jennifer L. Pollio, JAGC, USN |
| Appellate Defense Counsel: | Mr. Peter J. Van Hartesveldt, Esq. |
| | LT Jonathan C. Perry, USCGR |
| | LT Cara J. Condit, USCG |
| Appellate Government Counsel: | CDR Vasilios Tasikas, USCG |
| | LCDR Amanda M. Lee, USCG |

### BEFORE
### McCLELLAND, HAVRANEK & GILL
Appellate Military Judges

McCLELLAND, Chief Judge:

Appellant was tried by general court-martial composed of officer and enlisted members. Contrary to his pleas, Appellant was convicted of one specification of aggravated sexual assault and one specification of indecent act in violation of Article 120, Uniform Code of Military Justice (UCMJ); and one specification of indecent language and two specifications of communicating a nude photograph, in violation of Article 134, UCMJ. The court sentenced Appellant to confinement for 621 days, reduction to E-1, and a bad-conduct discharge. The Convening Authority approved the sentence.

Before this court, Appellant has assigned the following errors:

I.      The military judge abused his discretion when he denied the defense motion for the production of the testimony of a forensic psychologist.

II.     The record of trial is incomplete to the substantial prejudice of Appellant.

III.    The military judge erred by improperly limiting the scope of constitutionally required rebuttal evidence under M.R.E. 412.

IV.    The evidence with regard to Charge II, Specification 1, alleging indecent language, was insufficient.

V.     Charge II, Specification 1, alleging indecent language should be set aside because of an unreasonable multiplication of charges.

VI.    Charge II, Specifications 2 and 5, alleging a violation of UCMJ Article 134 by sending or showing a nude picture of M.M. should be set aside because Appellant did not have fair notice that such conduct was criminal.

VII.   This Court should consider the unreasonable and unexplained post-trial delay in determining the sentence that should be approved under Article 66(c), UCMJ.

We specified this issue:  Whether Charge II, Specifications 2 and 3 (originally labeled Specification 5) fail to state an offense in that they do not include any word of criminality, such as "wrongfully."

We heard oral argument on issues I and VI and the specified issue on 5 November 2013. On 26 February 2014 Appellant filed a supplemental assignment of error based on appellate delay.  We affirm.

## Expert witness

Appellant received the pre-trial assistance of a Government-funded expert forensic psychologist, but no funding was provided for the expert's presence at trial.  Trial counsel had recommended against approval of funding for the latter as premature.  (Appellate Ex. XLIII at 14-15.)  Seventeen days before trial, on 13 January 2012, the defense moved to compel the production of the expert as a witness.  (Appellate Ex. XLIII.)  The Government opposed the motion and contended that it was untimely.  (Appellate Ex. XLVIII at 3-7.)  The military judge

denied the motion, but stated that he would entertain a statement or stipulation of testimony of a forensic psychologist. (R. at 140-41.)[1] The defense did offer a Powerpoint presentation prepared by a forensic psychologist, which was admitted. (Defense Ex. J.)

Before addressing this first assignment of error, it is appropriate to dispose of the second. Appellant claims that the record is incomplete because the military judge denied the motion for expert witness by email and the email is not included in the record of trial. We reject this claim, as the military judge stated his ruling on the record. (R. at 140.) The fact that his statement referred to the email does not support an inference that his statement was incomplete. If in fact there was more in the email than in the statement on the record, the ruling on the record must nevertheless stand on its own, unless this would prejudice Appellant. No prejudice to Appellant has been identified.

Appellant complains that the military judge did not apply the correct standard in determining whether the witness should be produced, and also erred in finding the motion untimely.

A party is entitled to the production of a witness whose testimony would be relevant and necessary. Rule for Courts-Martial 703(b)(1), Manual for Courts-Martial, United States (2012 ed).[2] A ruling denying a request for production of a witness is reviewed for abuse of discretion. *United States v. Rockwood*, 52 M.J. 98, 104 (C.A.A.F. 1999) (citing *United States v. Ruth*, 46 M.J. 1, 3 (C.A.A.F. 1997)).

Factors to be considered in deciding whether production of a witness is necessary include, but are not limited to: "the issues involved in the case and the importance of the requested witness as to those issues; whether the witness is desired on the merits or the sentencing portion of the trial; whether the witness' testimony would be merely cumulative; and the availability of alternatives to the personal appearance of the witness, such as deposition,

---

[1] The military judge also denied a defense request for oral argument on the motion. (R. at 141.) This denial appears to run afoul of R.C.M. 905(h). *See United States v. Savard*, 69 M.J. 211, 213 (C.A.A.F. 2010). We view the error as harmless.

[2] The provisions of the Manual for Courts-Martial cited in this opinion are identical in the 2008 and 2012 editions.

interrogatories or previous testimony." *Ruth*, 46 M.J. at 4 (quoting *United States v. Tangpuz*, 5 M.J. 426, 429 (C.M.A. 1978)). Essential for consideration of a request for an expert witness are: "(A) the qualifications of the expert, Mil.R.Evid. 702; (B) the subject matter of the expert testimony, Mil.R.Evid. 702; (C) the basis for the expert testimony, Mil.R.Evid. 703; (D) the legal relevance of the evidence, Mil.R.Evid. 401 and 402; (E) the reliability of the evidence, *United States v. Gipson*, 24 M.J. 246 (C.M.A. 1987), and Mil.R.Evid. 401; and (F) whether the 'probative value' of the testimony outweighs other considerations, Mil.R.Evid. 403." *Id.* (quoting *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993)). Returning to the fundamental question of whether production of the witness is necessary, "the proper standard is helpfulness, not absolute necessity." *United States v. Combs*, 39 M.J. 288, 291 (C.M.A. 1994) (quoting *United States v. Meeks*, 35 M.J. 64, 68 (C.M.A. 1992)).

The military judge made the following statement of his ruling denying the motion for the expert witness, referring to an email he had sent on 18 January 2012 and an R.C.M. 802 session on 21 January 2012:

> During that 802 and [that email], I stated that [the motion and a motion for reconsideration thereof] were denied both for lack of timeliness and failure to show necessity. I acknowledged that the impact of alcohol consumption on the alleged victim in this case is a factual issue to be proven but was not convinced that expert testimony was necessary to enhance the fact-finders' ability to make conclusions in that regard. In my e-mail I noted that the impact of alcohol's consumption on memory is not outside the realm of knowledge and experience for most adults either from personal observation or experience. In the absence of any empirical evidence of the alleged victim's blood alcohol level at the time of the incident and some variance as to the rate of the alleged victim's alcohol consumption, the application of forensic expertise is not required or necessary.

> I remain convinced that Congress did not intend to require the use of an expert to prove or disprove incapacity due to alcohol under Article 120. Incapacity is meant to remain an issue for the fact-finder to determine based on the evidence presented and the fact-finders' common sense and knowledge of the ways of the world. Requiring an expert here, in the absence of empirical evidence requiring scientific interpretation, pretty much – of the function of the fact-finder and would effectively augment 120 by requiring the use of an expert.

> Though I stated in the 802 on 21 January that I found the statement of the expert was not necessary, . . . I did indicate to defense counsel that I would entertain the written statement or a stipulation of expected testimony from the expert and his curriculum vitae.

(R. at 140-41.)

We note that the military judge, in denying the motion, did not discuss any of the six "*Houser* factors." It appears that none of them was at issue. He also did not explicitly discuss the four "*Tangpuz* factors," but he implicitly addressed "the issues involved in the case and the importance of the requested witness to those issues," in the language of *Tangpuz*. He also suggested an alternative, a nod to the final *Tangpuz* factor. The significant aspect we perceive to be missing from his analysis is consideration of "helpfulness, not [merely] absolute necessity," identified as the proper standard in *Combs* and *Meeks*.

However, we agree with the military judge that the expert witness was not necessary for this case.

The accused was charged with having engaged in a sexual act with Seaman M while she was substantially incapacitated. The evidence established that she began drinking alcohol (three-quarters of a bottle of champagne) in her barracks room in the early evening, continued drinking (champagne and jello shots) at a Halloween costume party at an off-base residence, and drank more (Lemon Drops, "Jager Bomb", rum and coke) at Bernie's, a bar in downtown Kodiak, Alaska. She had no memory of leaving that bar at closing time. Other than a fragmentary memory of trying to retrieve her ID outside an after-hours club, she had no memories of any events between speaking to shipmates at Bernie's and waking up in her barracks room at 1100 the next morning. She described her condition during the interim as "blacked out."

In advance of trial, the accused requested the appointment of, among other experts, a forensic psychologist. (Appellate Ex. XLIII at 9.) The convening authority approved funding for ten hours consultation with the forensic psychologist. (Appellate Ex. XLIII at 15.) The accused later requested funding to have the forensic psychologist testify at trial. (Appellate Ex. XLIII.) The proffer in support of that request asserts, in essence, that the forensic psychologist's expert testimony is necessary to explain to members that an individual who is "blacked out" may be awake and conscious but that her ability to encode or store information in memory is not

working properly—a concept that the accused contends is counter-intuitive to lay members' perceptions and expectations. (Appellate Ex. XLIII at 33-34.)

There may be a case where expert assistance would be helpful to explain that a "blackout" is not synonymous with being either unconscious or substantially incapacitated. This is not that case. Seaman M never contended that she was unconscious throughout her "blackout" period. She simply explained that she could not recall events that occurred during the blackout period. When asked at trial what she meant by the term "black out," she replied, "Just lost memory." (R. at 549). On cross-examination, she acknowledged that she had no recollection of any events between being at Bernie's and waking up in her room at 1100 the next morning— except for a flashback of reaching for her ID card to gain access to the after-hours club. (R. at 577-578). Referring to the sexual act alleged in Charge I, Specification 1, defense counsel asked Seaman M:

Q. You have no recollection. So you don't know whether you consented.

A. Correct.

(R. at 578).

The Government called a number of witnesses who testified that Seaman M was not unconscious during the period she described as "blacked out." They included various witnesses who saw her at Bernie's and helped steady and support her on the walk from Bernie's to the after-hours club (R. at 368-69, 413-15); a Kodiak police sergeant who saw her being denied admission to the after-hours club (and told those accompanying her that they needed to get her home or she would be taken into protective custody) (R. at 446-48); the government vehicle driver who transported Seaman M back to the base (pulling over en route so she could get fresh air and throw up, if necessary) and helped steady her as she exited the van (R. at 391-93); and a colleague who helped steady and support her from the van to the door of her barracks room, at which point Appellant accompanied her inside the room and closed the door (R. at 416-19). Each of those witnesses described Seaman M as performing some sort of conscious activity during the period she described as "blacked out" of her memory.

Inasmuch as the uncontroverted evidence presented to the members established that Seaman M was able to speak (though slurred) and ambulate (with assistance) during her self-described "blackout" period, we agree with the trial judge that expert testimony was not necessary to dispel any misconception that her blackout was synonymous with unconsciousness. Her ability to recall events during that period may have been impaired, but she remained capable of some level of conscious activity at least up to the time she entered her barracks room. The separate and material issue is whether she was substantially incapacitated at the time of the sexual act alleged. The defense proffer failed to demonstrate how Dr. Holguin's testimony would have helped the members resolve that question.

Furthermore, we are not insensitive to the danger that the requested expert might invade the province of the fact-finder. Finally, even if the military judge technically erred in his analysis leading to denial of the motion and we were to agree with Appellant that the testimony of the forensic psychologist would have proved helpful to the members (with which we do not agree), we find that such an error, in light of all the evidence presented at trial, is harmless beyond a reasonable doubt.

**Rebuttal evidence and M.R.E. 412**

Appellant was convicted of aggravated sexual assault upon Seaman M for having intercourse with her while she was substantially incapacitated. There was evidence that after midnight on the night of that incident, Appellant, Seaman M, and one other servicemember were riding in the liberty van back to their barracks, all of them having been drinking. The driver testified that at one point he speculated that Seaman M might be giving Appellant oral sex (R. at 401, 410), although he later thought the sound he heard might have been someone vomiting or dry-heaving (R. at 394). The other passenger in the van testified that at one point Seaman M and Appellant were kissing and making out. (R. at 417-18, 428.)

Seaman M testified that she could not remember anything from a point before the ride in the van until the next morning. (R. at 520, 549-51.) The next morning, she testified, she had a telephone conversation with Appellant during which he stated that she "tried giving him head in the [government vehicle]." (R. at 555.) She testified that she did not believe that statement

7

because "I'm not normally like that, with people I have no chemistry with especially." (R. at 562.) She later clarified that by "chemistry," she was referring to people to whom she would be so attracted that she would have sex with them, and that she had never had oral sex with a person to whom she was not attracted. (R. at 570.)

In response, the defense sought to call rebuttal witnesses who would testify that Seaman M had engaged in kissing and making out with people with whom she did not have sexual chemistry. (R. at 564.) The military judge ruled that he would not allow such a witness, although he would have allowed a rebuttal witness who claimed Seaman M had had oral sex with someone with whom she did not have sexual chemistry, indicating that such a witness would fall within the Constitutional exception of M.R.E 412. (R. at 565-66.)

Appellant asserts that the military judge erred in limiting rebuttal to testimony about oral sex, thereby excluding his proffered witnesses. A military judge's decision to exclude evidence under M.R.E. 412 is reviewed for abuse of discretion. *United States v. Banker*, 60 M.J. 216, 223 (C.A.A.F. 2004).

We find no error in the military judge's ruling. It is rather difficult to rebut an assertion that is as qualified ("I'm not *normally* like that") and subjective (who other than Seaman M can determine whether the requisite "chemistry" is present?) as the one in question. The proffered evidence was minimally relevant at best, and its probative value was certainly outweighed by its time-wasting character. This is particularly true since there was uncontroverted evidence that Seaman M kissed and made out with Appellant himself in the liberty van, as noted above. Evidence that someone else had also done the same with Seaman M would have added nothing to Appellant's case.

### Indecent language specification

Appellant urges us to set aside the finding of guilty of Charge II, Specification 1, indecent language, for factual insufficiency. We decline to do so. We are convinced beyond a reasonable doubt of Appellant's guilt.

Appellant also urges us to find the indecent language specification to be an unreasonable multiplication of charges. *See United States v. Quiroz*, 55 M.J. 334 (C.A.A.F. 2001). We do not consider it to constitute an unreasonable multiplication of charges. Also, we are confident that it did not affect the sentence.

## Specifications alleging sending and showing a nude photograph

Specifications 2 and 3 (originally specifications 2 and 5) of Charge II under Article 134, UCMJ, allege in pertinent part as follows:

> In that [Seaman Thoms] did, at or near Kodiak, Alaska, on or about 16 October 2010, send/show a nude picture of [Seaman M, a female Coast Guard member] to [specified recipients/observer] without [Seaman M]'s permission, which conduct was of a nature to bring discredit upon the armed forces.

As previously noted, we specified the issue of whether these specifications fail to state an offense for lacking words of criminality, such as "wrongfully."

"Basic to alleging and proving a punishable offense is the existence and identification of a wrongful act or acts that meet the requirements of either or both of the clauses [of Article 134]." *United States v. Hester*, 68 M.J. 618, 620 (C.G.Ct.Crim.App. 2010) (quoting *United States v. Henderson*, 32 M.J. 941, 947 (N.M.C.M.R. 1991)). A specification under Article 134 alleging an offense not listed in the Manual for Courts-Martial must include words of criminality to be legally sufficient. *United States v. Vaughan*, 58 M.J. 29, 35 (C.A.A.F. 2003) (citing *United States v. Davis*, 26 M.J. 445, 447-48 (C.M.A. 1988)); *United States v. Brice*, 17 USCMA 336, 38 C.M.R. 134, 138-39 (1967) (citing *United States v. Julius*, 8 USCMA 523, 25 C.M.R. 27 (1957)); *see* Rule for Courts-Martial 307(c)(3) Discussion (G)(ii), Manual for Courts-Martial, United States (2008 ed.); *see also United States v. Daly*, 69 M.J. 549, 552 (C.G.Ct.Crim.App. 2010) ("It is certainly true that a word of criminality such as 'wrongfully' is essential to an adequate specification."), *rev'd on other grounds*, 69 M.J. 485 (C.A.A.F. 2011); *Hester*, 68 M.J. at 621 & n.4.

Specifications that are first challenged after trial are viewed with greater tolerance than those challenged at trial. *United States v. Watkins*, 21 M.J. 208, 209 (C.M.A. 1986).

The Government contends that words of criminality are not required to state an offense under Article 134, arguing that *United States v. Davis*, 26 M.J. 445 (C.M.A. 1988) precludes a holding that the absence of "wrongfully" or any other word of criminality in the specification is a fatal defect.

In *Davis*, the male accused was charged with two specifications of wearing women's clothing, including nylon stockings, bra, nail polish, and the like, "to the prejudice of good order and discipline and of a nature to bring discredit upon the Armed Forces." *Davis*, 26 M.J. at 447. The appellant argued that the specifications were fatally defective because they lacked words of criminality. *Id.* The Court of Military Appeals rejected the argument, opining that "the 'wrongfulness' of the conduct consisted of its threat to good order and discipline and its discredit to the armed forces," and declaring that the allegations of those two elements made the specifications legally sufficient. *Id.* at 448-49. The court observed, "The particular facts and surrounding circumstances recited in the specifications [which included the specific locations of the charged conduct] in this case describe conduct on a military installation which virtually always would be prejudicial to good order and discipline and discrediting to the Armed Forces." *Id.* at 449. The latter observation must be regarded as part of the holding, in view of the opinion's confirmation that a specification must "contain words of criminality or . . . set forth acts that might be prejudicial to good order and discipline or service-discrediting." *Id*.

One can understand the Court of Military Appeals, in *Davis* in 1988, calling cross-dressing in certain circumstances "virtually always . . . prejudicial to good order and discipline and discrediting to the Armed Forces." The question is whether the same can be said of the allegations in this case (specifying discredit to the armed forces, the element alleged in the specifications at issue).

We are inclined to say that, indeed, a servicemember's publication to other people (with no indication that those people had an official function) of a nude picture of a servicewoman without her permission would virtually always be of a nature to bring discredit upon the armed forces. Accordingly, under *Davis*, the specifications at issue are adequate to allege an offense.

We turn to the question of whether Appellant had fair notice that the conduct alleged in the two specifications is punishable. *See Parker v. Levy*, 417 U.S. 733 (1974). Potential sources of "fair notice" include federal law, state law, military case law, military custom and usage, and military regulations. *United States v. Saunders*, 59 M.J. 1, 6 (C.A.A.F. 2003) (*citing Vaughan*, 58 M.J. at 31-32).

Appellant asserts that "there is no precedent for such activity being criminal." However, as noted by the Government, there is a federal statute criminalizing the conduct alleged in Charge II Specification 2 (i.e., e-mailing a nude picture to a third person without consent), namely 18 U.S.C. §1801. At least seventeen states and the District of Columbia have statutes criminalizing the same conduct.[3] We think these suffice to give notice that Appellant's conduct, as alleged, was criminal.

We note, too, that Appellant's conduct of disseminating a picture of a nude sleeping or unconscious female fellow servicemember is surely contrary to the well-known military custom of taking care of fellow servicemembers, whether it be on the battlefield, during perilous missions at sea, or in a barroom brawl. It also runs afoul of the Coast Guard's core values of "honor" and, especially, "respect."

As for Charge II Specification 3, at least ten states have statutes criminalizing the conduct alleged therein.[4] It is not so clear that this, by itself, was enough to give Appellant notice that his conduct, in showing a nude picture of Seaman M to another seaman without Seaman M's permission, was criminal. *See United States v. Merritt*, 72 M.J. 483, 488 (C.A.A.F. 2013) ("[T]he fact that three states criminalized the conduct does not satisfy the constitutional

---

[3] Ariz. Rev. Stat. Ann. § 13-3019 (2006); Conn. Gen. Stat. § 53a-189b (2013); D.C. Code § 22-3531 (2013); Fla. Stat. § 810.145 (2012); Idaho Code Ann. § 18-6609 (2013); Ky. Rev. Stat. Ann. § 531.100 (West 2013); Mass. Gen. Law. ch. 272, § 105 (West 2009); Mo. Ann. Stat. § 565.252 (2012); Nev. Rev. Stat. § 200.604 (2012); N.J. Stat. Ann. § 2C:14-9 (West 2013); 18 Pa. Cons. Stat. § 7507.1 (2012); R.I. Gen. Laws § 11-64-2 (2004); S.C. Code Ann. § 16-17-470 (2012); Tenn. Code Ann. § 39-13-605 (West 2012); Tex. Penal Code Ann. § 21.15 (West 2007); Utah Code Ann. § 76-9-702.7 (West 2013); Vt. Stat. Ann. Tit. 13, § 2605 (2010); W. Va. Code § 61-8-28 (2000).

[4] Ariz. Rev. Stat. Ann. § 13-3019 (2006); Conn. Gen. Stat. § 53a-189b (2013); Idaho Code Ann. § 18-6609 (2013); Mass. Gen. Law. ch. 272, § 105 (West 2009); Nev. Rev. Stat. § 200.604 (2012); N.J. Stat. Ann. § 2C:14-9 (West 2013); R.I. Gen. Laws § 11-64-2 (2004); Tenn. Code Ann. § 39-13-605 (West 2012); Vt. Stat. Ann. Tit. 13, § 2605 (2010); W. Va. Code § 61-8-28 (2000).

requirement of fair notice;" conduct not otherwise prohibited does not become criminalized solely due to its proximity to prohibited conduct.).

We note that the Coast Guard Shipboard Regulations Manual, COMDTINST M15000.7A, which applied to Appellant (who was assigned to USCGC ALEX HALEY (WMEC-39)) on the date alleged, prohibits any crewmember from displaying or distributing "lewd or obscene movies, videos . . ., writings, photographs, or drawings." Article 2-63-1.3. Arguably, this punitive regulation is only enforceable with respect to conduct aboard the cutter, but the evidence was that Appellant's conduct did take place aboard the cutter.[5] We think the picture in question was lewd or obscene, particularly where the image was captured and shown without the consent of the victim.

As already noted, Appellant's conduct was contrary to the custom of taking care of fellow servicemembers and contrary to Coast Guard core values.

In the context of this case, the issue of fair notice essentially comes down to the question of whether someone standing in Appellant's shoes, wishing to conform his conduct to the requirements of the law but contemplating the act that subsequently results in criminal liability, should know that commission of the act could, in fact, result in criminal liability. We are comfortable answering that question in the affirmative. Taking all the sources of notice together, we conclude that Appellant had notice of the criminality of his conduct alleged in Charge II Specification 3.

Even if both of these specifications were set aside, the facts underlying them are aggravation of Specification 2 of Charge I alleging the photographing of Seaman M's genitalia and buttocks. The sentence is well below the maximum sentence for the remaining findings. We are certain the sentence would not have been different without these specifications, or either of them.

---

[5] The specification did not allege any location other than "at or near Kodiak, Alaska," the homeport of ALEX HALEY.

**Post-trial delay**

Appellant urges us to grant sentence relief on account of unreasonable post-trial delay in the Convening Authority's action, and in our decision.

Sentencing took place on 3 February 2012. The Convening Authority took action on 4 June 2012, 122 days after sentencing. The case was referred to this Court on 3 July 2012. Appellant asserted the right to a timely appeal on 18 February 2014.

The Court of Appeals for the Armed Forces (CAAF) applies "a presumption of unreasonable delay that will serve to trigger the *Barker* four-factor analysis where the action of the convening authority is not taken within 120 days of the completion of trial[,] where the record of trial is not docketed by the service Court of Criminal Appeals within thirty days of the convening authority's action[, and] where appellate review is not completed and a decision is not rendered within eighteen months of docketing the case before the Court of Criminal Appeals." *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). The "*Barker* four-factor analysis" comprises consideration of the following four factors to determine whether post-trial delay constitutes a due process violation: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Id.* at 135 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).

Appellant does not claim a due process violation with respect to the Convening Authority's action, but invokes *Moreno* in support of his claim that the delay in this case is unreasonable. Although the Convening Authority exceeded the 120-day Moreno standard by only two days, that delay is sufficient to raise the presumption under *Moreno*. Accordingly, we will carry out the *Barker* four-factor analysis.

The Convening Authority's action was delayed two days beyond the 120-day period prescribed by *Moreno*. The Government, in its brief, offers no explanation, but calls the delay *de minimus*.

We agree with the Government that the two-day delay is *de minimis*.  The first and second *Barker* factors weigh against the Government to an insignificant degree.  As for the third and fourth factors, Appellant did not assert the right to timely referral and does not claim any particularized anxiety and concern or other prejudice.  These factors do not weigh against the Government.  Considering all factors, we find no due process violation.

We turn now to Appellant's argument that we should grant sentence relief under *United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002), which held that we may grant relief for excessive post-trial delay without a showing of prejudice.  *Id.* at 224.  Upon finding unreasonable and unexplained post-trial delay, this Court may consider such delay, along with all the other facts and circumstances, in exercising its responsibilities under Article 66(c), UCMJ.  *Id.*  We have granted such relief in several cases in the past few years.  However, we agree with the Government that the two-day delay in this case does not warrant relief.

Concerning appellate delay, Appellant claims a due process violation based on the fact that this decision is being issued after 3 January 2014.  We granted a motion to attach his affidavit describing prejudice in limitation of ability to obtain employment, and in mental stress and anxiety with resulting physical manifestations (high blood pressure and shaking of hands and fingers) and social effects.

The trial transcript is 914 pages long.  The appellate course of this case has included a few circumstances that extended it to some degree.  Appellant's brief was submitted seventy days beyond the normal due date, under enlargements granted by this Court (a part of which was due to the absence of a prosecution exhibit from Appellant's copy of the record of trial).  We specified an additional issue and ordered briefing on it, entailing sixty days for additional briefing.  Appellant's motion for oral argument was granted; scheduling of oral argument was slightly delayed by the departure from the Court of one of the judges on the original panel for the case, which was therefore assigned to a different panel.  As already noted, oral argument was heard on 5 November 2013.

We do not think the appellate delay in this case is egregious.  In any event, if there is a due process violation, it is harmless beyond a reasonable doubt.  *See United States v. Allende*, 66 M.J. 142, 145 (C.A.A.F. 2008).  Further, we are not inclined to grant relief under *Tardif* for appellate delay.

No relief is granted on account of post-trial delay.

### Decision

We have reviewed the record in accordance with Article 66, UCMJ.  Upon such review, the findings and sentence are determined to be correct in law and fact and, on the basis of the entire record, should be approved.  Accordingly, the findings of guilty and the sentence, as approved below, are affirmed.

Judges HAVRANEK and GILL concur.



For the Court,


Joseph M. Guyton
Clerk of the Court