# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40222**

————————————

**UNITED STATES**
*Appellee*

**v.**

**DeShaun L. WELLS**
Airman (E-2), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 23 May 2023

————————————

*Military Judge*: Charles E. Wiedie (arraignment); Willie J. Babor (warrant application); Matthew N. McCall.

*Sentence*: Sentence adjudged 28 July 2021 by GCM convened at Royal Air Force, Lakenheath, United Kingdom. Sentence entered by military judge on 23 August 2021: Bad-conduct discharge, confinement for 255 days, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant*: Major Kasey W. Hawkins, USAF.

*For Appellee*: Lieutenant Colonel Thomas J. Alford, USAF; Major John P. Patera, USAF; Captain Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, CADOTTE, and ANNEXSTAD, *Appellate Military Judges*.

Judge CADOTTE delivered the opinion of the court, in which Senior Judge RICHARDSON and Judge ANNEXSTAD joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

CADOTTE, Judge:

A general court-martial comprised of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification each of assault consummated by a battery, obstruction of justice, and extramarital sexual conduct, in violation of Articles 128, 131, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 928, 931, 934.[1,2] The members sentenced Appellant to a bad-conduct discharge, 255 days of confinement,[3] two months restriction to the limits of Royal Air Force (RAF) Lakenheath, United Kingdom (UK), two months hard labor without confinement, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority disapproved the adjudged restriction and hard labor without confinement, but otherwise did not disturb the adjudged sentence.

Appellant raises seven assignments of error, which we have reworded, combined, and reordered, claiming: (1) Appellant was deprived of his right to a unanimous verdict; (2) the evidence supporting the convictions for extramarital sexual conduct, assault consummated by a battery, and obstruction of justice is legally and factually insufficient;[4] (3) the military judge erred by allowing the victim's counsel to deliver the victim's unsworn statement without good cause shown; (4) the military judge abused his discretion by permitting the members to consider an "inappropriately inflammatory victim impact statement which impeached the verdict;" and (5) Appellant's sentence is inappropriately severe.

We have carefully considered issue (1) and determine no discussion or relief is warranted. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). We find no material prejudice to a substantial right of Appellant and Appellant is not entitled to relief.

## I. BACKGROUND

Appellant was assigned to RAF Lakenheath, United Kingdom. Within a year of getting married at the age of 20 to another Air Force member, Appellant

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*).

[2] The court members found Appellant not guilty of 12 specifications.

[3] Appellant served 255 days of pretrial confinement.

[4] We have combined three assignments of error raised by Appellant. Appellant raised legal and factual insufficiency for his assault consummated by a battery and obstruction of justice convictions pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

engaged in sexual relationships with women outside his marriage, including BF and SH. Ultimately, members found Appellant guilty of three specifications—extramarital sexual conduct involving BF, assault consummated by a battery against SH, and obstruction of justice—which were outgrowths of these relationships.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant challenges the sufficiency of the extramarital sexual conduct, assault consummated by a battery, and obstruction of justice convictions. We resolve each of these challenges adverse to Appellant and conclude the convictions are legally and factually sufficient.

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). The evidence supporting a conviction can be direct or circumstantial. *See United States v. Long*, 81 M.J. 362, 368 (C.A.A.F. 2021) (citing R.C.M. 918(c)) (additional citation omitted). "[A] rational factfinder[ ] [may] use [its] 'experience with people and events in weighing the probabilities' to infer beyond a reasonable doubt" that an element was proven. *Id.* at 369 (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). The "standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (internal quotation marks and citation omitted).

"The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of the appellant's guilt beyond a reasonable doubt." *Rodela*, 82 M.J. at 525 (alterations, internal quotation marks, and citation omitted). "In conducting this unique appellate role, we take 'a

fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017), *aff'd* 77 M.J. 289 (C.A.A.F. 2018) (alteration in original) (quoting *Washington*, 57 M.J. at 399). "The term reasonable doubt . . . does not mean that the evidence must be free from conflict." *Id.* (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)).

### a. Extramarital Sexual Conduct

For Appellant to be found guilty of the offense of extramarital sexual conduct, the Government was required to prove beyond a reasonable doubt that Appellant: (1) wrongfully engaged in extramarital conduct with BF; (2) Appellant knew at the time that he was married to someone else; and (3) under the circumstances, the conduct was of a nature to bring discredit upon the armed forces. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 99.b.

Covered "extramarital conduct" consists of genital, oral, and anal to genital sexual intercourse; and oral to anal sexual intercourse. *MCM*, pt. IV, ¶ 99.c.(2). The President explained generally for offenses under Article 134, UCMJ: "'Discredit' means to injure the reputation of. This clause of Article 134 makes punishable conduct which has a tendency to bring the service into disrepute or which tends to lower it in public esteem." *MCM*, pt. IV, ¶ 91.c.(3). The President further explained service-discrediting conduct in the context of extramarital conduct:

> Extramarital conduct may be Service discrediting, even though the conduct is only indirectly or remotely prejudicial to good order and discipline. "Discredit" means to injure the reputation of the armed forces and includes extramarital conduct that has a tendency, because of its open or notorious nature, to bring the Service into disrepute, make it subject to public ridicule, or lower it in public esteem. While extramarital conduct that is private and discreet in nature may not be service discrediting by this standard, under the circumstances, it may be determined to be conduct prejudicial to good order and discipline.

*MCM*, pt. IV, ¶ 99.c.(1).

Our court recently addressed service-discrediting conduct as the terminal element:

> "Whether any given conduct [is service-discrediting] is a question for the trier of fact to determine, based upon all the facts and circumstances; it cannot be conclusively presumed from any

particular course of action." [*United States v. Phillips*, 70 M.J. 161, 165 (C.A.A.F. 2011)]. "[T]he degree to which others became aware of the accused's conduct may bear upon whether the conduct is service discrediting," but actual public knowledge is not a prerequisite. *Id.* at 166. "The trier of fact must determine beyond a reasonable doubt that the conduct alleged actually occurred and must also evaluate the nature of the conduct and determine beyond a reasonable doubt that [the appellant]'s conduct would tend to bring the service into disrepute if it were known." *Id.* (citing *United States v. Saunders*, 59 M.J. 1, 11 (C.A.A.F. 2003)).

*United States v. Heppermann*, 82 M.J. 794, 801–802 (A.F. Ct. Crim. App. 2022), *rev. denied*, 83 M.J. 103 (C.A.A.F. 2022).

### b. Assault Consummated by a Battery

For Appellant to be found guilty of assault consummated by a battery, the Government was required to prove beyond a reasonable doubt: (1) Appellant did bodily harm to a certain person, SH; (2) the bodily harm was done unlawfully; and (3) the bodily harm was done with force or violence. *See MCM*, pt. IV, ¶ 77.b.(2)(a)–(c). "Bodily harm" means an offensive touching of another, however slight. *MCM*, pt. IV, ¶ 77.c.(1)(a). "A battery is an assault in which the attempt or offer to do bodily harm is consummated by the infliction of that harm." *MCM*, pt. IV, ¶ 77.c.(3)(a). "[E]ven if an alleged victim did not consent to being touched, an accused cannot be convicted of assault consummated by a battery if the accused mistakenly believed the alleged victim consented and that belief was 'reasonable under all the circumstances.'" *United States v. Mader*, 81 M.J. 105, 108 (C.A.A.F. 2021) (quoting R.C.M. 916(j)(1)).

### c. Obstruction of Justice

For Appellant to be found guilty of obstruction of justice, the Government was required to prove beyond a reasonable doubt: (1) Appellant wrongfully did a certain act; (2) did so in the case of a certain person against whom the accused had reason to believe there were or would be criminal or disciplinary proceedings pending; and (3) the act was done with the intent to influence, impede, or otherwise obstruct the due administration of justice. *See MCM*, pt. IV, ¶ 83.b.(1)–(3).

## 2. Extramarital Sexual Conduct

### a. Additional Background

In November 2019—while he was married—Appellant met a British national, BF, through the electronic dating application Tinder. BF testified that Appellant first told her that he was divorced, but a week later said he was

actually in the process of getting divorced.[5] Appellant and BF entered a dating relationship, to include sexual intercourse, which lasted several months. BF spent weekends at Appellant's home and they discussed marriage and having children together. BF testified that during the relationship Appellant also met BF's parents. In January 2020, BF discovered Appellant was not actually in the process of divorcing his spouse. BF contacted the Appellant's command's public affairs office via email and reported, *inter alia*, that Appellant lied to her about being divorced. During cross-examination, BF stated her sexual relationship with Appellant did not make her think less of the Service.

At trial, and in response to circuit trial counsel's questions, BF testified about an intimate video of her and Appellant:

> Q. [D]id you ever come to learn about videos that he may have still had in his possession after your relationship was over?
>
> A. Yes.
>
> Q. Can you talk to us a little bit about that?
>
> A. It was towards the end of last year. I was having loads of Brandon[, UK,] people request me on Instagram, local girls from the area, and I'm not originally from the area, so it was a bit concerning to me. So I ended up messaging one of them and I was like, do I know you because I was concerned that something was going around about me. She had explained that she had also dated [Appellant]. She had told me that he had been sharing intimate videos of me and pictures of me with people. That's how I came to light on the videos that were being shared.

BF identified the person she messaged regarding the video as LW. LW, who also had engaged in a romantic relationship with Appellant, met with BF in person. LW described to BF a video that included BF and "mentioned a bathtub." BF testified she "knew exactly what time that was because there was only one time we had had sex in the bath." LW also testified and explained Appellant showed her the video and that afterwards she contacted BF. Later, BF and LW went to Appellant's home to confront him. Appellant was not home; however, Appellant's wife was present and they addressed the video with her instead. The video of Appellant and BF engaging in sexual conduct was also

---

[5] Appellant was found not guilty of the other offenses for which BF was the alleged victim.

uploaded to a publicly accessible pornographic website and viewed at least 817 times.[6]

### b. Analysis

Appellant claims his conviction for extramarital sexual conduct is not legally or factually sufficient because the Government did not prove the terminal element of the offense—i.e., the conduct was of a nature to bring discredit upon the armed forces. Appellant alleges "not only was there no evidence" of his conduct being service-discrediting, there was "actually contrary evidence." We disagree.

Appellant asks this court to distinguish his case from *Phillips* where the Court of Appeals for the Armed Forces held "evidence that the public was actually aware of the conduct is not necessarily required" and "proof of the conduct itself *may* be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that, under the circumstances, it was of a nature to bring discredit upon the armed forces." 70 M.J. at 163. We find no reason to distinguish *Phillips*; consequently, we follow our superior court's decision.

Appellant also focuses on BF's testimony that Appellant's conduct did not adversely impact her view of the military. However, the Government does not need to prove anyone's "opinion of the military was lowered." *United States v. Moore*, No. ACM S32477, 2018 CCA LEXIS 560, at *21 (A.F. Ct. Crim. App. 11 Dec. 2018) (unpub. op.). Moreover, a factfinder is "not required to accept" the views of a witness, and "could consider other evidence in determining whether Appellant's conduct tended to discredit the service." *Heppermann*, 82 M.J. at 802.

From our review of the record, we are convinced the evidence is both legally and factually sufficient. We find there was ample evidence for the trier of fact to determine "beyond a reasonable doubt that [Appellant]'s conduct would tend to bring the service into disrepute if it were known." *Saunders*, 59 M.J at 1. The evidence supports a finding that Appellant's sexual relationship with BF was neither private nor discreet. In fact, the evidence established Appellant showed a video of his extramarital sexual conduct to others and it was available to the general public to view on a website. As the video depicts Appellant engaging in intimate sexual acts with BF, it is strong evidence of the "open or notorious nature" of the extramarital conduct.

When viewing the evidence offered at trial in the light most favorable to the Government, a rational factfinder could readily find the essential elements

---

[6] Members found Appellant not guilty of a specification of indecent broadcasting in violation of Article 120c, Uniform Code of Military Justice, 10 U.S.C. § 920c.

of extramarital sexual conduct beyond a reasonable doubt. We therefore conclude the evidence is legally sufficient to support Appellant's conviction. Giving the appropriate deference to the trial court's ability to see and hear the witnesses, and after our own independent review of the record, we ourselves are convinced of Appellant's guilt beyond a reasonable doubt. Accordingly, we also find the evidence factually sufficient.

### 3. Assault Consummated by a Battery

#### *a. Additional Background*

Appellant met another British civilian, SH, on Tinder in November 2019. After communicating with SH for several weeks, Appellant met her in person. Appellant picked up SH and her friend from SH's friend's home, and they went to Appellant's home. SH went inside to use Appellant's bathroom. Afterwards, Appellant "pulled" her to the living room sofa, where she consensually performed oral sex on Appellant. SH's friend remained in Appellant's car, then knocked on Appellant's door requesting to go home. The three left Appellant's home, and a few hours later Appellant and SH returned. Upon arriving at Appellant's home, SH and Appellant "shot gunned" a beer together. During trial, and in response to circuit trial counsel's questions, SH testified about what happened next with Appellant:

> A. He pulled me into the living room just like normal, like he did before, and he turned around and slapped me in the face.
>
> Q. Was there any kind of a prelude to that? Had there been any incident or disagreement with you?
>
> A. No. Nothing.
>
> Q. How hard did he slap you in the face?
>
> A. Not very hard. I kind of laughed like in shock, like well kind of and then he done it again, so I hit him back and then he hit me again the third time like really, really hard.
>
> Q. When you said that he hit you, are we open hand --
>
> A. Slap.
>
> Q. -- closed hand. It was a slap. Where did he actually hit you on your body?
>
> A. On my face.
>
> Q. You said that you hit him back after the second strike.
>
> A. Mmm-Hmm.
>
> Q. Where did you hit him?

A. On the face.

Q. How did you hit him?

A. Not as hard as he hit me.

Q. I mean, closed fist, open hand?

A. Slap.

Q. You slapped him back?

A. Yes.

Q. Prior to him slapping you the first time, had you been play fighting or --

A. No.

Q. -- any type of -- were you even -- was there any physical contact?

A. No. It was just walking into the room and he just turned around and slapped me in the face.

Q. All right. After you slapped him, was the slap that you received significantly different than the first two even?

A. Yes, a lot harder.

Q. How did it impact you physically?

A. I felt dizzy. It just took a few seconds to actually come back in the room. It went dark and, yes, I was very dizzy.

Q. I want to go all of the way back from the first time that you met [Appellant] to this point, had you ever told him that you like to be slapped or that that was okay?

A. No. Definitely not.

Q. Had you ever had a history of play fighting with him or anything like that?

A. No.

Q. What happened after that more significant slap?

A. He drug me to the sofa the same way he did before, but more aggressively. He sat down and pulled me down and forced my head down and, yeah, forced himself inside my mouth.[7]

---

[7] Members found Appellant not guilty of a specification of a violation of Article 120, UCMJ, 10 U.S.C. § 920, for which SH was the alleged victim.

Appellant was convicted of striking SH "in the face with his hand."

### b. Analysis

Appellant asserts SH "was not initially offended by the slapping, and only became offended when necessary to make an allegation against [Appellant]." Appellant further argues SH's demeanor during the slapping indicates she consented to the slapping, or that Appellant had an honest and reasonable mistake of fact as to SH's consent to being slapped. Finally, Appellant argues SH initiated oral sex on Appellant immediately following the slap, which illustrates that she was not offended by the slap. Based on the foregoing, Appellant argues his conviction is not legally and factually sufficient. We disagree.

We find SH's testimony describing the facts and circumstances surrounding Appellant's slapping her to be compelling. SH testified Appellant "pulled [her] into the living room . . . just like he did before, and he turned around and slapped [her] in the face." SH stated there was no prelude to the slap and that she "kind of laughed like in shock." After Appellant slapped her again, SH hit him back and Appellant responded by hitting her "really, really hard." SH testified that she never communicated to Appellant that she liked to be slapped, or that she found slapping acceptable. SH explained they were not play fighting. Based on SH's testimony, SH was offended and did not consent to being slapped. Likewise, the evidence also supports the conclusion that Appellant did not have an honest and reasonable mistake regarding SH's consent to him slapping her. We see no evidence that would show Appellant honestly, much less reasonably, believed SH wanted him to slap her in the face. We also find no merit to Appellant's argument that his conduct could not have been offensive because SH performed oral sex on him after he struck her.

When viewing the evidence offered at trial in the light most favorable to the Government, a rational factfinder could readily find the essential elements of assault consummated by a battery—and the absence of affirmative defenses—beyond a reasonable doubt. We therefore conclude the evidence is legally sufficient to support Appellant's conviction. Giving the appropriate deference to the trial court's ability to see and hear the witnesses, and after our own independent review of the record, we ourselves are convinced of Appellant's guilt beyond a reasonable doubt and find the evidence factually sufficient.

### 4. Obstruction of Justice

#### a. Additional Background

On 3 December 2020, while Appellant was in pretrial confinement, pursuant to a search warrant, Air Force Office of Special Investigations (AFOSI) agents coordinated with Appellant's spouse to search Appellant's home and ve-

hicle for electronic devices. After AFOSI agents conducted the search, Appellant's wife spoke with Appellant by phone. She explained to Appellant that AFOSI agents were looking for electronic devices. Unfortunately for Appellant, the phone call was being monitored by confinement facility staff, SSgt JG and SrA TV. SSgt JG testified that Appellant asked his wife to log into his Snap-Chat and Instagram social media accounts. The couple discussed the usernames and passwords for the accounts. During the call, Appellant's wife logged into an account while Appellant instructed her to delete it. SrA TV also overheard Appellant instruct his wife to delete conversations with some people on his social media.

On the same day, Snapchat sent an email to Appellant that his account was deactivated, and a follow-up email that Appellant's account would be deleted in 30 days.

### b. Analysis

Appellant claims his conviction is not legally and factually sufficient because the Government failed to prove he had the intent to influence, impede, or otherwise obstruct justice when he asked his wife to delete his social media accounts and messages. We are not persuaded.

Appellant suggests it is reasonable to interpret the evidence as showing Appellant and his wife discussed deleting their conversations only because they did not want them read by other people. However, another reasonable interpretation is that Appellant was asking his wife to delete evidence of his misconduct. The sequence of Appellant's conversation with his wife is strong circumstantial evidence that Appellant was not merely attempting to keep communications with his wife private. Appellant's request to his wife to delete digital evidence from his social media accounts took place just after she informed him AFOSI had searched his home and vehicle for electronic devices. We find there was ample evidence to support the conclusion Appellant's intent was to influence, impede, or obstruct AFOSI's criminal investigation into Appellant.

When viewing the evidence offered at trial in the light most favorable to the Government, a rational factfinder could readily find the essential elements of obstruction of justice beyond a reasonable doubt. We, therefore, conclude the evidence is legally sufficient to support Appellant's conviction. Giving the appropriate deference to the trial court's ability to see and hear the witnesses, and after our own independent review of the record, we ourselves are convinced of Appellant's guilt beyond a reasonable doubt.

## B. Victim Impact Statement

Appellant claims the military judge erred when he allowed the victim's counsel for SH to deliver her unsworn victim statement without good cause

shown. Appellant further alleges the military judge abused his discretion when he permitted the members to consider what Appellant characterizes as "an inappropriately inflammatory victim impact statement which impeached the verdict." Appellant asks us to set aside his sentence as a remedy. We find relief is not warranted.

### 1. Additional Background

Appellant was convicted of striking SH in the face with his hand. SH's counsel presented a written three-page statement to the court and read it to the members verbatim on SH's behalf. Appellant's trial defense counsel objected to the contents of the statement, arguing, "[I]t doesn't relate specifically to the offense for which the accused was convicted. Instead, it's our position that it makes, throughout the unsworn statement, unveiled reference[s] to those things in which the accused was acquitted of and it's our position that that's improper." Trial defense counsel further stated, "[T]his is then just a way to shoehorn those offenses for which the accused was acquitted into the unsworn statement, thereby, not explicitly, but it's impeaching the verdict."

The military judge then asked the victim's counsel if the impact described in the unsworn statement stemmed from the slap. In response, the victim's counsel stated that the statement was created after the findings and SH's words "directly track R.C.M. 1001(c) to discuss impact directly arising from or directly relating to the offense."

The military judge explained that "if the victim says this is how they have been impacted from the slap, this is how they've been impacted by the slap." The military judge stated that he declined to be "a lie detector for the victim." The military judge further explained, "The victim is allowed to say what that impact is if that's what they feel is deriving directly relating to or arising from that slap." However, at the request of the military judge, some changes were made to the original statement to replace some plural words to singular, such as changing "choices" to "choice."

SH's statement, as presented to members, began, "My name is [SH] and I thank you for the opportunity to provide this Victim Impact Statement before the Honorable Court in accordance with my Article 6b rights. I have asked my Special Victims' Counsel to read this statement on my behalf."

SH's counsel read the following statements from SH's victim impact statement:

> Beyond the physical pain that [Appellant] caused me, the deep emotional wounds that [Appellant's] selfish choice inflicted has left real psychological scars.
>
> . . . .

12

For the longest time, I felt like I was to blame for [Appellant's] choice that night. The idea I had created an atmosphere where I could be assaulted haunted me in invisible and permanent ways. I felt completely hopeless and ashamed for letting this freakish crime happen to me. . . . It is not my fault that [Appellant] took this deliberate and disdainful action.

. . . .

The trauma of [Appellant's] violent offense has impacted my day-to-day life in ways I never imagined.

. . . .

When [Appellant] committed this vile act, he didn't just steal my peace of mind, he also stole the social and family life I cherished.

. . . .

No one in or outside the Air Force should ever have to go through the abuse I suffered at the hands of this arrogant and selfish individual. No woman in Britain or America should ever be threatened by his sick and despicable behavior ever again.

Appellant's trial defense counsel did not object to SH's counsel reading of SH's statement to the members. The military judge did not make an express finding of "good cause" regarding SH's counsel presenting SH's statement on her behalf.

**2. Law**

We review a military judge's interpretation of R.C.M. 1001 de novo, but review a decision regarding the presentation of a victim-impact statement in presentencing for an abuse of discretion. *See United States v. Hamilton*, 78 M.J. 335, 340 (C.A.A.F. 2019) (considering a previous version of R.C.M. 1001); *United States v. Barker*, 77 M.J. 377, 382–83 (C.A.A.F. 2018) (same).[8] A military judge abuses his discretion when he makes a ruling based on an erroneous view of the law. *Barker*, 77 M.J. at 383. Similarly, "[a] military judge abuses his discretion when his legal findings are erroneous . . . or when he makes a clearly erroneous finding of fact." *United States v. Edwards*, 82 M.J. 239, 243 (C.A.A.F. 2022) (internal citations omitted).

---

[8] Rules addressing a victim's right to be reasonably heard were contained in R.C.M. 1001A, *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM)*. However, those rules are now contained in R.C.M. 1001(c). *See MCM*, App. 15, at A15-18 ("R.C.M. 1001(c) is new and incorporates R.C.M. 1001A of the [2016 *MCM*]."). Our analysis cites to these versions as applicable.

When an appellant does not object to the presentation of victim matters, we review for plain error. *See United States v. Gomez*, 76 M.J. 76, 79 (C.A.A.F. 2017). An appellant bears the burden of establishing: "(1) there was error; (2) the error was clear or obvious; and (3) the error materially prejudiced a substantial right." *Id.* (citation omitted). When testing for prejudice in the context of sentencing, we determine whether the error substantially influenced the adjudged sentence by considering the following four factors: "(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Hamilton*, 78 M.J. at 343 (quoting *United States v. Bowen*, 76 M.J. 83, 89 (C.A.A.F. 2017)). "An error is more likely to be prejudicial if the fact was not already obvious from the other evidence presented at trial and would have provided new ammunition against an appellant." *Barker*, 77 M.J. at 384 (citation omitted). An error is more likely to be harmless when the evidence was not "critical on a pivotal issue in the case." *United States v. Cano*, 61 M.J. 74, 77–78 (C.A.A.F. 2005) (internal quotation marks and citation omitted).

Article 6b, UCMJ, 10 U.S.C. § 806b, details several rights belonging to crime victims. Among these are the "right to be reasonably heard at . . . [a] sentencing hearing relating to the offense." Article 6b(a)(4)(B), UCMJ, 10 U.S.C. § 806b(a)(4)(B); *see also* R.C.M. 1001(c)(1) ("[A] crime victim of an offense of which the accused has been found guilty has the right to be reasonably heard at the presentencing proceeding relating to that offense.").

"The right to make an unsworn victim statement solely belongs to the victim or the victim's designee and cannot be transferred to trial counsel." *Edwards*, 82 M.J. at 241 (first citing *Hamilton*, 78 M.J. at 342; and then citing *Barker*, 77 M.J. at 378). This right "is separate and distinct from the [*G*]*overnment's* right to offer victim impact statements in *aggravation*, under R.C.M. 1001(b)(4)." *Id.* (quoting *Barker*, 77 M.J. at 378). "Upon good cause shown, the military judge may permit the crime victim's counsel . . . to deliver all or part of the crime victim's unsworn statement." R.C.M. 1001(c)(5)(B).

Notwithstanding a victim's right to be reasonably heard, a military judge has the responsibility to "[e]nsure that the dignity and decorum of the proceedings are maintained," and "exercise reasonable control over the proceedings[.]" R.C.M. 801(a)(2)–(3); *see also LRM v. Kastenberg*, 72 M.J. 364, 372 (C.A.A.F. 2013) (noting a victim's "right to a reasonable opportunity to be heard on factual and legal grounds" is "subject to reasonable limitations and the military judge retains appropriate discretion under R.C.M. 801").

"The crime victim may make an unsworn statement and may not be cross-examined on it by trial counsel, defense counsel, or the court-martial. The prosecution or defense may, however, rebut any statements of fact therein. The unsworn statement may be oral, written, or both." R.C.M. 1001(c)(5)(A). "The

content of [sworn and unsworn victim statements] may only include victim impact and matters in mitigation." R.C.M. 1001(c)(3).

### 3. Analysis

#### a. Victim's Counsel Reading Victim's Unsworn Statement

Appellant first raises whether the military judge erred by allowing special victims' counsel to deliver SH's unsworn statement aloud to the court members. Since Appellant did not object, we review for plain error. We begin our analysis with the presumption the military judge knew and followed the law, including when and how to apply the standard of whether good cause was shown. *See United States v. Erickson*, 65 M.J. 221, 224 (C.A.A.F. 2007) ("Military judges are presumed to know the law and to follow it absent clear evidence to the contrary."). Here, the record is clear this military judge was familiar with R.C.M. 1001(c), and we see no indication that the military judge failed to consider and find "good cause" before allowing the special victims' counsel to read the victim's statement to the members after SH specifically requested her counsel deliver it on her behalf. Furthermore, even if we assume the military judge committed error, we find no prejudice.

In this case, we find counsel's reading of the victim's statement provided no "new ammunition" against Appellant. *See Barker*, 77 M.J. at 384. Appellant argues that because SH did not personally deliver her statement, members were unable to evaluate her credibility and whether her delivery was with genuine emotion. We note, however, that SH already had testified during findings, so the members were familiar with her recitation of the facts of the case and her demeanor in describing them. We find Appellant's argument in that delivery of SH's statement by her counsel provided "new ammunition" against Appellant because SH did not personally deliver her statement—resulting in members being unable to observe and evaluate SH's credibility—without merit. SH was within her right to have presented the written statement alone without members having an opportunity to view SH's delivery of it. We find SH's counsel simply reading the written document to the court members did not amount to any significant addition to, or expansion of, the statement. *Cf. Edwards*, 82 M.J. at 246 (finding that in producing a victim-impact video containing images and music, "trial counsel made creative and organizational decisions that . . . incorporated her own personal artistic expression," and thereby "misappropriate[d] the victim's right to be heard"). Any error here was not prejudicial because it "did not involve the subject matter, but rather the form in which it was presented." *See United States v. Kerr*, 51 M.J. 401, 406 (C.A.A.F. 1999).

We further find special victims' counsel reading aloud the victim unsworn statement had no substantial influence on the sentence. This reading did not

change the strength of the parties' cases.[9] The readings were not an improper government attempt to "slip in evidence in aggravation that [ ] would otherwise be prohibited by the Military Rules of Evidence." *Hamilton*, 78 M.J. at 342. Had the victim personally read her statement to the members, she *may* have imparted more emotion than counsel, whose reading did not add substance to the words on the page. We are not convinced Appellant suffered any prejudice when special victims' counsel read SH's victim statement aloud to the court members in this case. Finding no prejudicial error, we decline to grant relief on this issue.

### b. Content of Victim Impact Statement

Appellant argues the military judge abused his discretion when he permitted the members to consider what he calls an inappropriately inflammatory victim impact statement which impeached the verdict. We are not persuaded.

The military judge did not abuse his discretion when he allowed SH's victim impact statement to be presented to members in accordance with R.C.M. 1001. The military judge clearly applied the correct law, specifically considering "the parameters of R.C.M. 1001 and what is proper for a victim impact statement." The military judge's ruling is supported by the record; SH's statement is written such that her claimed impact can be attributed to the single offense against her for which Appellant was found guilty. The military judge reasonably concluded that, on its face, SH's statement did not refer to matters for which Appellant was found not guilty, and consequently, the statement did not impeach the verdict. The military judge's legal findings were not erroneous and he did not make a clearly erroneous finding of fact. *Edwards*, 82 M.J. at 243. We find the military judge did not abuse his discretion.

## C. Sentence Severity

Appellant claims his sentence is inappropriately severe considering the nature and seriousness of the offenses of which he was convicted. Appellant characterizes these offenses as "low-level" and, according to him, "routinely disposed of via summary courts-martial or nonjudicial punishment."[10] Appellant

---

[9] The victims were not parties, and their unsworn statements were not part of the Government's case. *See Edwards*, 82 M.J. at 245; *L.R.M.*, 72 M.J. at 368 (finding the victim was a "nonparty to the court[ ]-martial"). We acknowledge, however, that the content of these statements favored the Government.

[10] Appellant also argued we should engage in sentence comparison under *United States v. Lacy*, 50 M.J. 286 (C.A.A.F. 1999), as a result of LW receiving a letter of counseling for her participation in obstruction of justice with Appellant. We have carefully considered this issue and determine no discussion or relief is warranted. *See Matias*, 25 M.J. at 361. We find that Appellant is not entitled to relief.

argues, consequently, "the punitive discharge and lengthy confinement adjudged in this case are inapposite." We disagree and find no relief is warranted.[11]

We review sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2016). We "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as [we] find correct in law and fact and determine[ ], on the basis of the entire record, should be approved." Article 66(c), UCMJ. "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam) (citations omitted). While we have great discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

Appellant contends the adjudged bad-conduct discharge and 255 days of confinement are excessive. We disagree and do not find Appellant's sentence inappropriately severe considering the maximum punishment available and the record before us. The maximum sentence available for the offenses for which Appellant was convicted was a dishonorable discharge, six years and six months of confinement, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. Appellant not only committed an offense involving physical violence and participated in an open and notorious extramarital affair, but to cover up these crimes, he requested his wife destroy digital evidence. We have given full individualized consideration to Appellant and to the appropriateness of his sentence. After careful consideration of the matters contained in the record of trial which were before the members, the nature and seriousness of Appellant's offenses, and his record of service, we find the sentence is not inappropriately severe.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).

---

[11] We have carefully considered all claims Appellant raised in assignment of error (5); some warrant discussion, but none warrant relief. *See Matias*, 25 M.J. at 361.

Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court